KRISTIN K. MAYES
Attorney General
Firm State Bar No. 14000

Kara Karlson, Bar No. 029407
Karen J. Hartman-Tellez, Bar No. 021121
Senior Litigation Counsel
Kyle Cummings, Bar No. 032228
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ  85004-1592
Telephone (602) 542-8323
Facsimile (602) 542-4385
Kara.Karlson@azag.gov
Karen.Hartman@azag.gov
Kyle.Cummings@azag.gov
adminlaw@azag.gov

*Attorneys for Defendant Arizona Secretary of State Adrian Fontes*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The No Labels Party of Arizona, an Arizona political party,<br><br>Plaintiff,<br><br>v.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State,<br><br>Defendant. | Case No:  2:23-cv-02172-JJT<br><br>**ARIZONA SECRETARY OF STATE'S EXPEDITED MOTION FOR A STAY PENDING APPEAL**<br><br>**(EXPEDITED CONSIDERATION WITHOUT ORAL ARGUMENT REQUESTED)** |

Pursuant to Federal Rule of Civil Procedure 62(c) and Federal Rule of Appellate Procedure 8(a)(1), Defendant Arizona Secretary of State Adrian Fontes respectfully requests that the Court stay its order regarding No Labels candidates, pending resolution of the Secretary's appeal of the Court's January 16, 2024 Order and Judgment (the

"Order"). Given the rapidly-approaching statutory deadlines for submitting candidate paperwork, the Secretary requests emergency relief from this Court.

## INTRODUCTION

An emergency stay pending appeal is necessary to avoid irreparable and severe harm to the Secretary and the public interest. At issue in this matter is the state of Arizona's century-old direct primary law, which has enabled Arizonans to join a party and express their political preference at the ballot box, rather than having nominees selected by party bosses. A stay will preserve the rights of Arizonans who have joined the No Labels party to participate as candidates and voters if the Court of Appeals has a different view of the appropriate balance of associational rights. Conversely, without a stay, the time for potential candidates to gather and submit signatures will have expired or been significantly shortened by the time an appellate decision is rendered.

It has been repeatedly recognized that the primary election is an integral part of the election system as a whole, and in many instances may be the outcome-determinative election. Indeed, a district that is weighted heavily in favor of one party or another may never even draw an opposing candidate, as has happened frequently (and recently).[1] Furthermore, sometimes a party may utilize a "single shot" approach in multi-member districts in an attempt to win swing districts.[2] The January 16 Order would allow the political parties themselves—not the voters—to determine the wisdom of participating in an election at all, or limiting the number of elections in which candidates are allowed to run. Moreover, under the Order, a party may make that decision behind closed doors, *after* voters have affiliated with that party, and *after* candidates have already invested

---

[1] *See, e.g.*, Ariz. Official Canvass at 2 (Dec. 5, 2022) *available at* https://apps.azsos.gov/election/2022/General/canvass/2022dec05_general_election_canvass_web.pdf (providing no challenger on the ballot, only write-in candidates, for Congressional Districts eight and nine).
[2] *Supra* at 6 (providing two Republican candidates for state representative for Legislative District two, but only one Democratic candidate, with a final result of bi-partisan representation of that district).

time and resources into a given race. Finally, the Order bars the Secretary from accepting additional statements of interest, but does not provide instruction on how to proceed with the candidates who have already filed statements of interest. As this Court recognized, the Secretary has a non-discretionary duty to accept paperwork filed by a candidate who has complied with state law. (DE 25, at 6-7). This is a step that is separate from printing or distributing ballots, which the Secretary does not do.

Given the significant issues posed by the relief obtained by the Plaintiff, the Secretary requests that this order be stayed pending expedited appeal.[3]

## BACKGROUND

The relevant factual background is included in the Secretary's Response (DE 16) and the parties' Stipulated Statement of Facts (DE 19), and is incorporated herein by this reference. Plaintiff No Labels Arizona filed a Complaint and Motion for Preliminary Injunction on October 19, 2023. (DE 1, 6). The Secretary filed a Response to the Preliminary Injunction on November 20, 2023. (DE 16). The preliminary injunction was fully briefed on December 18, 2023, (DE 18), and the preliminary injunction was consolidated with a final hearing on the merits by stipulation on November 3, 2023. (DE 11). The parties stipulated to relevant facts and exhibits, which were admitted by the Court as evidence. (DE 19, 22). This Court heard argument on January 5, 2024. (DE 20). It entered its final order on January 16, 2024. (DE 25). The Secretary has filed a Notice of Appeal and now seeks an emergency stay pending appeal in the first instance from this Court pursuant to Fed. R. App. P. 8(a).

## LEGAL STANDARD

---

[3] Due to the need for quick resolution of the appeal in view of fast-approaching election deadlines, the Secretary respectfully notifies this Court that he intends to file an Emergency Motion to Expedite Appeal with the Ninth Circuit and, if necessary, will seek a stay of this Court's Order from the appellate court.

The Court has the power to grant a stay "[w]hile an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction[.]" Fed. R. Civ. P. 62(d). In making a determination whether to grant a stay of the order, the Court is instructed to weigh four factors. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) . The factors are weighed on a sliding scale, and the stay should be granted if serious questions regarding the merits are raised and the balance of hardships weigh in the appellant's favor. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) ("Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor."); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) ("The same sliding scale approach applies to the consideration of stays pending appeal" as is used in the preliminary injunction test.). "[T]he harm to the opposing party and weighing the public interest . . . merge when the Government" is the party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

While the factors governing the issuance of an injunction and the factors to determine whether to grant a stay pending appeal substantially overlap, courts have repeatedly recognized that "[c]ommon sense dictates . . . that the legal standard cannot . . . require that a district court confess to having erred in its ruling" to satisfy the burden to grant such a motion. *Evans v. Buchanan*, 435 F. Supp. 832, 843 (D. Del. 1977); *see also Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 149 (D. Mass. 1998).

## **ARGUMENT**

This Court should grant the Secretary's motion for a stay pending appeal so the order does not interfere with the Secretary's ability to comply with state law while the appeal is heard. Urgent action is particularly important now, when the filing deadline for candidates to participate is rapidly approaching. (DE 19-1, at 115, 117) (nomination papers and petition signatures must be filed between March 9 and April 8, 2024).

**I.       The Secretary is Likely to Prevail on the Merits on Appeal.**

The United States Supreme Court has repeatedly re-affirmed the position that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 729-30 (1974). For that reason, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebreeze*, 460 U.S. 780, 788 (1983). "The Constitution does not require that [a State] compromise the policy choices embodied in its ballot-access requirements to accommodate [a political party's] strategy." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 365 (1997).

Arizona law, which allows a candidate who is a registered member of a political party and satisfies all other qualifications to obtain ballot access as a party member, is a reasonable, nondiscriminatory restriction on political party leadership's strategic choices. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.") (internal quotations and citation omitted). While Plaintiff asserted—after it had qualified for ballot access *and* after No Labels party members had already filed statements of interest to run as candidates—that it did not want candidates to participate in the election outside of its hand-picked, but unidentified, presidential and vice-presidential candidates, it cites no case supporting the idea that a political party can decide in which races it will participate. (DE 6, 18). That is because political parties are created to "reflect[ their] members' views about the philosophical and governmental matters that bind them together, [and] convince others to join those members in a practical democratic task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure." *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 615-16

1  (1996). They are not granted special recognition under the law to run a single race in a
2  single election, particularly when that purpose is developed *post hoc*.

3       This Court agreed that Arizona law required the Secretary to accept legally valid
4  statements of interest under Arizona law, but held that there was a violation of No
5  Labels' associational rights by distinguishing *Alaskan Independence Party*, 545 F.3d
6  1173 (9th Cir. 2008) ("*AIP*"), and relying upon *Tashjian v. Republican Party of Conn.*,
7  479 U.S. 208 (1986), and *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017)
8  (DE 25, at 6-7, 8-10). This reliance is misplaced.

9      **A. Binding Precedent Prohibits the Relief Provided.**

10      This Court properly identified that "[i]n cases such as this, the Court must weigh
11 'the character and magnitude of the asserted injury to the rights protected by the First
12 and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise
13 interests put forward by the State as justifications for the burden imposed by the rule.'"
14 (DE 25 at 10). This is the touchstone for all questions of election regulation. The same
15 holds true in this case where there is a "conflict between the party's wish to enforce
16 greater top-down control and the state's mandate that rank-and-file party voters have the
17 opportunity to consider and vote for any affiliated party member who seeks the
18 nomination." *AIP*, 545 F.3d at 1179.

19      In *AIP*, the Ninth Circuit had to balance whether Alaska's laws conflicted with
20 the political party's by-laws, and to the extent it did, whether the state law could
21 overcome the party's asserted right to structure its dealings as it desired. *AIP*, 545 F.3d
22 at 1175-76. Alaska's default rule (which is the same as Arizona's), requires direct
23 primary election by voters registered with that party and voters who are not affiliated
24 with a party. *Id.* at 1174. Under Alaska law (like Arizona), a member of a political
25 party could become a candidate on that party's primary ballot so long as that potential
26 candidate is a registered member of that party—*i.e.* associated with that party—and
27 meets certain other requirements set out in statute. *Id.* at 1175. In Alaska (and Arizona)
28

a voter may choose to affiliate with the party by registering with that party, "but the parties themselves do not exercise control over who may affiliate with the party in this way." *Id.* Finally, the bylaws of the minor parties in *AIP* (similar to No Labels here) provided for alternative mechanisms to select nominees on the general election ballot. *Id.* at 1176.

As this Court recognized, the primary system in Alaska is "similar to that of Arizona." (DE 25, at 7). Indeed, given the facts above, Alaska's primary system is in all relevant aspects indistinguishable from Arizona's. And Alaska's primary system was held by the Ninth Circuit to satisfy strict scrutiny. *AIP*, 545 F.3d at 1180 ("We have long recognized that a state's interest in eliminating the fraud and corruption that frequently accompanied party-run nominating conventions is compelling, and that a democratic primary is narrowly tailored to advance these state interests."). *AIP* was distinguished from the instant case on the basis that "[t]here, the court addressed whether a political party *that intended to run a candidate for an office* could pre-select its candidates for the primary election in contravention of the mandatory primary system." (DE 25, at 8).

Whether a party "intended to run" and participate in a given primary election appears to be the sole factor used to depart from the clear rule of *AIP*, and the Ninth Circuit should be given the opportunity to opine on this issue for at least three reasons.

*First*, the language in *AIP* clearly envisioned this form of partisan gamesmanship—pre-determining the outcome of an election by refusing to allow its members to participate in it—and rejected it. *AIP* said that the state's direct primary met strict scrutiny whether the law "compel[ed] them to nominate their candidates by primary election . . . or fail[ed] to allow them to 'exclude candidates.'" *AIP*, 545 F.3d at 1177. In this case, No Labels seeks to exclude all candidates but two, and that fits squarely within *AIP*. "Turning the entire electoral apparatus over to political parties would pose as great a threat to the integrity of our system of government as would the

7

state's unprincipled meddling in the political process." *Id.* at 1181.  Indeed, the court explained:  "The state's goals would clearly be impeded if party leaders could either *opt out of the primary altogether* or interfere with the democratic process by exercising veto power over the candidates that might seek the nomination." *Id.* (emphasis added).  In other words, the court explicitly contemplated the exact issue posed here—whether a party could force its members to sit out a primary election as voters and candidates—and rejected it for the same reason it rejected the third party's challenge to Alaska's primary process.  This is controlling precedent that should have determined the outcome in this case, and justifies the expedited issuance of a stay while the Ninth Circuit considers that issue.

*Second*, there is no administrable limiting principle in this order which allows the Secretary to follow state law and comply with parties' freedom of association, especially when the party holds unilateral authority to transform even the most mundane statutory framework, like the direct primary, into an infringement of their rights on a whim.  For example, during the one-month filing period the Secretary acts as the filing officer for hundreds of candidates from different parties.  The Secretary does not have the resources to verify that the bylaws for all political parties do not prohibit any particular candidates or class of candidates from running under that party's banner.  Even if he did, as this Court recognized, there is no legal mechanism which would allow the Secretary to reject those filings.[4]  And if the Secretary had the statutory authority to reject candidate filings in this case, the by-laws that require the rejection of any candidate not anointed by No Labels' corporate leadership were not adopted until *after* candidates had filed statements of interest with the Secretary. (DE 25 at 2).  In other words, even in a world of unlimited resources and omniscience, the Secretary would not have had the information necessary to reject these filings when they were presented to him, because No Labels failed to make governing documents for months after it achieved party status.  This is made even

---

[4] Absent a court order requiring rejection of that candidate or candidates' filings.

8

more untenable by the fact that parties can (and do) change their bylaws. Limited resources combined with no state-law mechanism by which the Secretary may legally review and reject candidate filings strongly militates in favor of a stay pending appeal, given the rapidly-approaching candidate filing deadlines for state candidates.

*Third*, there is no way to ensure candidates and voters are provided the information they need to make an educated choice about *their* association. In Arizona, a candidate must file a statement of interest before they begin collecting signatures to run for office. A.R.S. § 16-311(H). Any signatures collected prior to filing a statement of interest are invalid. *Id.* Some of the candidates filed their statements of interest before No Labels passed its bylaws. (DE 25 at 2). Moreover, the record is devoid of any evidence that the No Labels party took *any* steps to inform their candidates—who are members of No Labels based on the party's own definition—that they could not be a No Labels candidate. (DE 14, 19). Similarly, there is no evidence in the record that No Labels communicated with its own voters that there would not be a primary election. (*Id.*) Indeed, to the extent No Labels interacted with potential members in Arizona, it represented the opposite, that there *would* be a primary on August 6, 2024. (DE 19-1 at 15). Finally, the utter lack of notice or participation by any of other the 25,924[5] No Labels voters who are not on the No Labels board in making this decision, is compounded by the fact that No Labels' by-laws can be changed at will, without notice to anyone, by three members who were hand-selected by No Labels' corporate leadership to serve until death.

Whether No Labels' associational rights can be used to excuse it from participating in Arizona's semi-closed, direct primary is the central issue here. The Ninth Circuit and the United States Supreme Court have repeatedly upheld primary elections that, in all relevant aspects, are the same as Arizona's. At the consolidated

---

[5] Voter Registration Statistics, Ariz. Sec'y of State (Jan. 2, 2024) *available at* https://azsos.gov/elections/results-data/voter-registration-statistics (last visited Jan. 24, 2024).

hearing on the merits, the parties agreed that there are benefits that flow from political party status. It is wrong to allow a group of people to use the people of Arizona to obtain those benefits when it chooses to play by an undisclosed set of rules. And the right to associate has never been used—much less been held to require—that a political party be allowed to do so. This Court should stay its order while the Ninth Circuit considers this matter.

### B. The Cases Offered to Support this Court's Holding are Distinguishable and Not Binding.

In distinguishing the current case from *AIP*, the Court relied primarily upon the Supreme Court's decision in *Tashjian* and the Seventh Circuit's decision in *Scholz*. But these cases differ in important respects from the instant case. In *Tashjian*, Connecticut state law prohibited voters who were not affiliated with a party from voting a Republican party ballot in that state's primary, despite the fact that the party invited those voters to participate in choosing the party's nominees by amending the party's rules. 479 U.S. at 211. The court upheld the party's right to open its primary, creating a primary system that is in all material aspects identical to Arizona's. The Seventh Circuit case is not only non-binding on this Court, but also inapposite. In *Scholz*, the state law required the party to run candidates in *all* races to obtain ballot access for any races, which is nearly a precise inverse to the issue here. These cases should not restrict the Court's decision in this matter.

To begin with *Tashjian*, the facts differ significantly from the facts in this, and the legal principles announced in that decision are recitations of law consistent with many other cases. Those cases reflect a balanced approach to the right of association, not an absolutist one, and are consistent with the Secretary's position in this case. For example, the Court cited *Tashjian* for the familiar proposition that the political party could determine "the boundaries of its own association." (DE 25, at 9) (citing *Tashjian*, 479 U.S. at 224). But the *Tashjian* court explicitly rejected the argument that it should

1  "protect[] the integrity of the Party against the Party itself." 479 U.S.. at 224.  In seeking
2  an injunction that bars not Republicans or Democrats, but No Labels party members
3  from running as No Labels candidates, No Labels is asking this Court to do just that and
4  protect No Labels—more specifically *three* members of No Labels—from itself.  This
5  relief is not permitted, because the five No Labels candidates and the nearly 26,000
6  registered No Labels voters, are just as much members of the party as any other.

7  An analysis of *Storer v. Brown* may provide some insight as to why the quotations
8  from *Tashjian* are not outcome determinative here.  While *Tashjian* asserts that the party
9  has the right to determine "the boundaries of its own association" in allowing
10 independent voters to participate in a Republican party primary, *Storer* upheld a
11 California law that required a candidate to be disaffiliated for a year before that person
12 could run for office as that party's standard bearer.  415 U.S. at 734-35.  This holding
13 appears to conflict with a broad reading of *Tashjian*, that party desires always, or
14 generally, trump state law.  So under *Storer* and *Tashjian*, the ideal candidate could want
15 to become a member of a party, and that party could be welcoming him or her with open
16 arms, but that person would not be allowed to run due to state law, and that is
17 constitutionally permissible.  Because, as laid out in the Secretary's Response, the right
18 to association is not absolute. (DE 16, at 9-11).

19 The Seventh Circuit case requiring minor parties to run a full slate of candidates
20 to achieve ballot access for any candidate is even less helpful.  Illinois law required that
21 "the minor party must locate candidates for relatively obscure offices like county
22 recorder or coroner," and to ensure they are not sham candidacies, which could run afoul
23 of Illinois law, "a party must devote to each candidate the funding and other resources
24 necessary to operate a full-fledged campaign." *Scholz*, 872 F.3d at 524.  The full-slate
25 requirement, which is not at all similar to Arizona's laws, was unconstitutional because
26 "it prevents minor parties from affiliating with *anyone* on the ballot unless they mount
27 numerous additional campaigns." *Id.* at 524-25.  Because Arizona does not have a full-
28

slate requirement, there is no similar burden on No Labels to find and recruit candidates instead of focus on its main objective, running a third-party President and Vice President. Moreover, because there is no full-slate law in Arizona, No Labels is not required to devote *any* funding or resources to help any candidates except those it chooses. The burden in *Scholz* has no parallel here.

The thread running through all of the Supreme Court's ballot access cases that are predicated on the right to associate (or not) with a candidate, voter, or party, is that a party may welcome any voters to participate in its primary that it desires, or block anyone not affiliated with the party from choosing its nominee(s). *See, e.g.*, *Calif. Democratic Party v. Jones*, 530 U.S. 567 (2000), *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1971); *Jenness v. Fortson*, 403 U.S. 431 (1971). *No case* has ever held that a political party can block *its own members* from participating in selecting the party nominee for *all* elected offices.

## II. The Balance of Hardships and Public Interest Also Tip Sharply in the Secretary's Favor.

In the issuance of a stay where one party is the government, the balance of hardships and public interest merge. *Nken*, 556 U.S. at 435. The relief granted not only contravenes Arizona law, but it has done so in an unworkable manner. As an initial matter, the people of Arizona have an interest in ordered elections. *See Storer*, 415 U.S. at 729-30 ("[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."). That includes the path to ballot access. No Labels voters and would-be candidates are now shut out from participating in the primary election, which is an integral part of the election process in Arizona and has been since statehood. *See* Ariz. Const. art. 7, § 10. Yet they are *completely* barred from ballot access, both from the No Labels party primary ballot and from running as an unaffiliated candidate using the moniker "No Labels." This is a significant interest that has been quashed solely by the

party's rules. Similar efforts by an Arizona political party to use a party's preference have been recently rejected by the Ninth Circuit. *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1092 (9th Cir. 2019) (rejecting the Arizona Libertarian Party's contention that Arizona signature thresholds were unconstitutional because it would require an unconstitutionally high number of registered libertarians to sign them). As the Ninth Circuit wrote there: "A political party cannot manipulate its internal preferences and processes to transform a constitutional statute into an unconstitutional one." *Id.* at 1092. Yet that is precisely what No Labels has done here.

Additionally, the Order does not explain how it can be administered. Presumably, this right of association extends equally to all parties, and by its definition the Secretary is prohibited from accepting statements of interest from any No Labels candidate for any office. However, there is no mention of what to do with candidates who have already filed those statements of interest, and should they seek to submit nomination petitions, there is no statutory mechanism by which the Secretary can reject those petitions.[6] (DE 25, at 12).

Finally, the Court's judgment would allow any party to change its internal rules to limit who can join the party or run in future races at any time. Parties may prefer to run a single candidate in a swing legislative district to avoid splitting the vote between two candidates. If the political party amends its bylaws and pronounces certain districts as single-shot districts, then the winner of the primary in those districts would become that party's single choice for the general election. Arizona recently had two United States Senate races on the same ballot, and under the rationale here it appears that a political party could decide to field candidates for only one of those Senate races.

---

[6] While the Secretary can interpret the Court's order forbidding him from putting any No Labels candidate on the ballot as a directive not to accept any other filings from No Labels candidates, the Order does not expressly require the rejection of nomination papers, petitions, or other paperwork.

Indeed, No Labels adopted its by-laws months *after* Arizona voters were told by No Labels that they were signing a petition to support a new party that *would* participate in the August 2024 primary, and after candidates already filed statements of interest to run as candidates representing their own party. (DE 25, at 2). The scope of the right of association created by the judgment is unprecedented, giving political parties an unqualified right to decide in which races it chooses to participate whenever it pleases. Given the timeline in this case, the Order allows a party to amend its by-laws after candidate(s) filed the proper paperwork to qualify for the primary to prevent a disfavored candidate from being on the primary ballot, rather than follow the procedure under state law to challenge a candidate, or participate in the primary election to defeat an opposing candidate(s) in a democratic fashion. Nor is there anything in the Order that would prohibit a political party from revoking a disfavored candidate's ballot placement from the general election ballot after that person wins the primary election by demonstrating the required level of support from his or her fellow party members to earn a place on the ballot and then receive the winning number of votes to secure a place in the general election.

Ultimately, because No Labels chose to become a political party, this case is not just about No Label's ordained leadership, but the tens of thousands of Arizonans who signed petitions supporting the creation of a new political party—which told them there would be a No Labels primary on August 6, 2024—and the tens of thousands of Arizonans who have affiliated with the party by changing their registration. "Laws restricting a party's ballot access thus burden two rights: 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Scholz*, 872 F.3d at 523 (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). This is not a case about the three figureheads installed to select a candidate in a single race; it is about a radical shift in how to balance the state's legitimate interests in ensuring election integrity and

fairness and ensuring that parties—which include those parties' voters and potential candidates—are free from unwarranted interference. For these reasons, this Court should stay its Order pending appeal.

## CONCLUSION

Given the unique questions of law, the rapidly-approaching election deadlines, the reliance No Labels' members rightfully had on Arizona law and the representations No Labels itself made when seeking support to obtain party status, the Secretary respectfully requests that this Court stay its January 16, 2024 Order pending appeal.

Respectfully submitted this 26th day of January, 2024.

                Kristin K. Mayes
                Attorney General

                */s/ Kara Karlson*
                Kara Karlson
                Karen J. Hartman-Tellez
                Senior Litigation Counsel
                Kyle Cummings
                Assistant Attorney General
                *Attorney for Defendant Arizona Secretary of State Adrian Fontes*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of January, 2024, I filed the forgoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

/s/Monica Quinonez